1
2
3
4
5
6
7
8                    **UNITED STATES DISTRICT COURT**

9                    **SOUTHERN DISTRICT OF CALIFORNIA**

10

11   OSBORNE DEVELOPMENT
     CORPORATION,                          CASE NO. 10 CV 1772 MMA (BLM)

12                                         **ORDER RE: DEFENDANT**
                            Plaintiff,     **NORTH AMERICAN CAPACITY**
13                                         **INSURANCE COMPANY'S**
                                           **MOTION FOR SUMMARY**
14                                         **JUDGMENT;**

15                                         [Doc. No. 11]

16        vs.                              **PLAINTIFF'S MOTION FOR**
                                           **SUMMARY JUDGMENT**
17                                         **AGAINST DEFENDANT NORTH**
                                           **AMERICAN CAPACITY**
18                                         **INSURANCE COMPANY;**

19                                         [Doc. No. 12]

20                                         **PLAINTIFF'S MOTION FOR**
                                           **SUMMARY JUDGMENT**
21                                         **AGAINST DEFENDANT FIRST**
                                           **SPECIALITY INSURANCE**
22   FIRST SPECIALTY INSURANCE             **CORPORATION;**
     CORPORATION; NORTH AMERICAN
23   CAPACITY INSURANCE COMPANY; and       [Doc. No. 13]
     DOES 1-100, inclusive,
24                                         **DEFENDANT FIRST SPECIALTY**
                            Defendants.    **INSURANCE CORPORATION'S**
25                                         **MOTION FOR SUMMARY**
                                           **JUDGMENT**
26
27                                         [Doc. No. 14]

28

Currently before the Court are four cross-motions for summary judgment, including: (1) Defendant North American Capacity Insurance Company's ("NAC") motion for summary judgment against Plaintiff Osborne Development Corporation ("Plaintiff" or "Osborne") [Doc. No. 11][1]; (2) Plaintiff's motion for summary judgment against Defendant NAC [Doc. No. 12]; (3) Plaintiff's motion for summary judgment against Defendant First Speciality Insurance Corporation ("FSIC") [Doc. No. 13]; and (4) Defendant FSIC's motion for summary judgment against Plaintiff [Doc. No. 14].  On January 14, 2011, the Court in its discretion found the motions suitable for determination on the papers and without oral argument, pursuant to Civil Local Rule 7.1(d)(1). For the reasons set forth below, the Court **GRANTS** Defendants NAC's and FSIC's motions for summary judgment, and **DENIES** Plaintiff Osborne's motions for summary judgment.

## BACKGROUND

### I.   INSURANCE POLICIES

The following facts are not reasonably in dispute.  Plaintiff Osborne developed and acted as the general contractor on a project known as "Park Hill," ("Project" or "Park Hill Project") located in Riverside County, California.  [Doc. No. 1, Ex. A, ¶7.]  In connection with the Park Hill Project, Osborne obtained insurance from Defendant NAC and later Defendant FSIC. Specifically, NAC issued Osborne four consecutive Commercial General Liability ("CGL") policies for the periods: July 30, 2001 to July 30, 2002; July 30, 2002 to July 30, 2003; July 30, 2003 to July 30, 2004; and July 30, 2004 to July 30, 2005.  [Doc. No. 11-2, Nos. 1-4; *see also* Doc. No. 12-5, Exhs. A-D.]  Thereafter, Defendant FSIC issued Osborne a CGL policy for the period from July 30, 2005 to July 30, 2006.  [Doc. No. 14-2, No. 10; *see also* Doc. No. 12-5, Exh. E.]

/ / /

---

[1] In connection with NAC's motion for summary judgment it requests the Court take judicial notice of: (i) Plaintiff Osborne's complaint filed in state court on August 3, 2010; and (ii) the complaint filed by Agri-Empire against Osborne in state court on December 28, 2007.  [Doc. No. 11-3.]  The Court finds judicial notice of the existence of these two documents is appropriate under Federal Rule of Evidence 201, and therefore **GRANTS** NAC's request. Fed. R. Evid. 201 ("A judicially noticed fact must be one not subject to reasonable dispute in that it is . . . capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."); *Lee v. City of Los Angeles*, 250 F.3d 668, 689-90 (9th Cir. 2001) (court may take judicial notice of *existence* of court opinion, but not "'the truth of the facts recited therein.'").

The coverage dispute between Osborne and its insurers primarily focuses on the following standard provisions that appear in each policy.  Sections I(1)(a) and (b) provide:

> We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages.  However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.  We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result.
>
> . . .
>
> This insurance applies to "bodily injury" and "property damage" only if: (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and (2) The "bodily injury" or "property damage" occurs during the policy period.

Sections V(13) and (17) of the policies define "occurrence" and "property damage," respectively, as follows:

> "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.
>
> . . .
>
> "Property damage" means: (a) Physical injury to tangible property, including all resulting loss of use of that property.  All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or (b) Loss of use of tangible property that is not physically injured.  All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

[*See* Doc. No. 12-5, Exhs. A-E.]

## II.   UNDERLYING STATE ACTION AGAINST INSURED

On December 28, 2007, Agri-Empire filed a complaint in state court against Osborne and other defendants not relevant to the present action, alleging seven claims for relief regarding Osborne's development and construction of the Park Hill Project, including: (1) Quiet Title; (2) Interference with Water Rights; (3) Trespass; (4) Nuisance; (5) Negligence; (6) Declaratory Relief; and (7) Injunctive Relief.   [Doc. No. 12-5, Exh. F.]  The scope of Agri-Empire's complaint is crucial to the action pending before this Court, specifically, whether Defendants NAC and FSIC have a duty to defend Osborne against Agri-Empire's claims.  Accordingly, the Court sets forth a detailed summary of the relevant allegations in the underlying action below.

Agri-Empire asserts it "is the owner of an Easement and Water Rights on the property []
commonly known as 'Park Hill' as indicated on the Grant of Easement and Water Rights dated
August 17, 2000 by San Jacinto Development, Inc. . . . ."  [*Id.* at Exh. F, ¶10.]  Agri-Empire also
asserts it is "the owner in fee and is in possession and control of the real property and
improvements identified as Assessor's Parcel No. 438-530-020 (known as "Agri Well No. 3") as
indicated on the Grant Deed signed on August 17, 2006 by Osborne Development Corporation and
recorded on October 4, 2006 . . . ."  [*Id.* at Exh. F, ¶11.]  Copies of the grant deeds are attached to
the complaint.

Agri-Empire alleges it "intends to use Agri Well No. 3 as a municipal water source in the
future" as a source of income.  [*Id.* at Exh. F, ¶12.]  However, Osborne's development of the Park
Hill Project has interfered with Agri-Empire's access to and ability to use Agri Well No. 3.  Agri-
Empire identifies six allegedly wrongful acts by Osborne, which Agri-Empire did not discover
until approximately April 2007:

(1)  Osborne tampered with Agri Well No. 3 by "removing approximately 8' to 10' of
the dirt around the well, exposing a portion of the sanitary seal, thereby decreasing
the depth of the annular seal from the ground service to approximately 40' to 42'."

(2)  Osborne "created a vertical slope on Lot 48 located South of Agri Well No. 3
creating the potential for runoff to be directed to the well."

(3)  "Osborne has caused to be constructed a block retaining wall located on Lot 48 to
the South of the Agri Well No. 3 which will not allow for the creating of [the] base
[required by the Department of Health] without removal of the wall and additional
land from Lot 48."

(4)  "Osborne has not provided to [Agri-Empire] enough property at Agri Well No. 3 to
allow [Agri-Empire] proper access to the well for testing, maintenance, or usage."

(5)  In developing Park Hill, Osborne "constructed a home near Agri Well No. 3 in
which the home's sewer line was within 50' of Agri Well No. 3 in violation of State
regulations and Health and Safety Code."

(6)     Osborne "removed or caused to be removed a 4" access pipe that has cut off [Agri-Empire's] access to the Agri Well No. 3."

[*Id*. at Exh. F, ¶¶13-19.]

III.    **FEDERAL ACTION AGAINST INSURERS**

(A)     **Osborne's Tender to Insurer NAC**

By letter dated October 31, 2008, Osborne tendered its defense of the Agri-Empire action to Defendant NAC.  [Doc. No. 12-3, Exh. 1.]  The letter included copies of Agri-Empire's complaint, as well as an amendment to the complaint filed on January 4, 2008.  [*Id*.][2]  Counsel for Osborne and NAC exchanged correspondence during the following months.  On March 3, 2009, NAC formally declined coverage on several grounds.  [Doc. No. 12-3, Exh. 6.]  Osborne challenged NAC's denial of coverage and offered additional information in support of its tender for a defense and indemnity.  [Doc. No. 12-3, Exh. 7.]  NAC again denied coverage by letter dated August 26, 2009.  [Doc. No. 12-3, Exh. 8.]  In December 2009, Osborne disputed NAC's second denial of coverage; NAC issued another denial in February 2010 and again declined to defend Osborne in the Agri-Empire action.  [Doc. No. 12-3, Exhs. 9-10]

(B)     **Osborne's Tender to Insurer FSIC**

Osborne similarly tendered its defense to Defendant FSIC by letter dated October 31, 2008, including a copy of the operative Agri-Empire complaint and amendment.  [Doc. No. 13-3, Exh. 1.]  By March 2009, Osborne had not received a response from FSIC and sent a second formal tender letter.  [Doc. No. 13-3, Exh. 5.]  By letter dated April 30, 2009, FSIC agreed to defend Osborne under a Reservation of Rights pending further investigation.  [Doc. No. 13-3, Exh. 7.]  In February 2010, however, FSIC informed Osborne it had determined there are no potentially covered claims against Osborne in the Agri-Empire action, and that FSIC's participation in Osborne's defense would terminate on March 25, 2010.  [Doc. No. 13-3, Exh. 8.]  On March 25, Osborne sent FSIC a letter challenging its conclusion that Agri-Empire's claims were not covered

---

[2] The substance of the limited amendment does not affect the allegations against Osborne for purposes of the action before this Court.

1  by the applicable policy.  [Doc. No. 13-3, Exh. 9.]  By letter dated April 7, 2010, FSIC reaffirmed

2  its decision to withdraw from Osborne's defense.  [Doc. No. 13-3, Exh. 10.]

3  **(C)  Osborne's Action Against NAC and FSIC**

4  On August 3, 2010, after both carriers denied coverage, Osborne commenced the present

5  action against NAC and FSIC in state court alleging claims for: (i) declaratory relief; (ii) breach of

6  contract; (iii) and breach of the implied covenant of good faith and fair dealing.  [Doc. No. 1, Exh.

7  A.]  NAC and FSIC removed the state action to this Court on August 24, 2010.  Through their

8  pending cross-motions for summary judgment the parties seek a declaration regarding whether

9  Defendants NAC and FSIC have a duty to defend Osborne in the underlying Agri-Empire action.

10  For the reasons set forth below, the Court concludes neither NAC nor FSIC has a duty to defend

11  Osborne.

12  **LEGAL STANDARD**

13  Pursuant to Federal Rule of Civil Procedure 56, a party is entitled to summary judgment "if

14  the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

15  affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

16  party is entitled to a judgment as a matter of law."  *Hubbard v. 7-Eleven*, 433 F. Supp. 2d 1134,

17  1139 (S.D. Cal. 2006) (citing former Fed. R. Civ. P. 56(c)(2)).  It is beyond dispute that "[t]he

18  moving party bears the initial burden to demonstrate the absence of any genuine issue of material

19  fact."  *Horphag Research Ltd. v. Garcia*, 475 F.3d 1029, 1035 (9th Cir. 2007) (citation omitted).

20  "Once the moving party meets its initial burden, . . . the burden shifts to the nonmoving party to

21  set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a

22  genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (internal

23  quotation marks and citations omitted).

24  A mere scintilla of evidence is not sufficient "to defeat a properly supported motion for

25  summary judgment; instead, the nonmoving party must introduce some 'significant probative

26  evidence tending to support the complaint.'"  *Fazio v. City & County of San Francisco*, 125 F.3d

27  1328, 1331 (9th Cir. 1997) (quoting *Anderson*, 477 U.S. at 249, 252).  Thus, in opposing a

28  summary judgment motion it is not enough to simply show that there is some metaphysical doubt

as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citations omitted). However, when assessing the record to determine whether there is a "genuine issue for trial," the court must "view the evidence in the light most favorable to the nonmoving party, drawing all reasonable inferences in h[is] favor." *Horphag*, 475 F.3d at 1035 (citation omitted). On summary judgment, the Court may not make credibility determinations; nor may it weigh conflicting evidence. *See Anderson*, 477 U.S. at 255. Thus, as framed by the Supreme Court, the ultimate question on a summary judgment motion is whether the evidence "presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251-52.

In insurance actions where the insurer's duty to defend is at issue, "an insured moving for summary judgment need only show the existence of a potential for coverage, i.e. that the underlying claim may fall within policy coverage. Whereas, an insurer moving for summary judgment must establish the absence of any potential for coverage, i.e. that the underlying complaint can by no conceivable theory raise a single issue which could bring it within the policy coverage." *Lakeland Village Homeowners Assoc. v. Great Am. Ins. Grp.*, 727 F. Supp. 2d 887, 890 (E.D. Cal. 2010) (internal marks and citations omitted). Although the insurer bears a greater burden when moving for summary judgment, this merely reflects the substantive law. *Id*. Any doubt as to whether the underlying complaint gives rise to a duty to defend must be resolved in the insured's favor. *Id.*

## DISCUSSION

### I.   INSURERS' DUTY TO DEFEND

In *Scottsdale Ins. Co. v. MV Transportation*, 36 Cal. 4th 643, 654-55 (2005), the California Supreme Court succinctly summarized when an insurer has a duty to defend its insured under California law.

> An insurer must defend its insured against claims that create a *potential* for indemnity under the policy. The duty to defend is broader than the duty to indemnify, and it may apply even in an action where no damages are ultimately awarded.
>
> Determination of the duty to defend depends, in the first instance, on a comparison between the allegations of the complaint and the terms of

1    the policy.  But the duty also exists where extrinsic facts known to the
     insurer suggest that the claim may be covered. . . .

2

3        . . .

4    [I]n an action wherein none of the claims is even potentially covered
     because it does not even possibly embrace any triggering harm of the
     specified sort within the policy period caused by an included
5    occurrence, the insurer does not have a duty to defend.

6    (internal marks and citations omitted) (emphasis in original).  If the insurer owes a duty to defend

7    its insured against a single claim, it is obligated to defend against all the claims.  *Lakeland Village*,

8    727 F. Supp. 2d at 891 (quoting *Horace Mann Ins. Co. v. Barbara B.*, 4 Cal. 4th 1076, 1081

9    (1993)).

10       When interpreting insurance policies the Court utilizes general contract interpretation

11   principles.  Under California law, if the insurance policy language is clear and unambiguous it

12   governs, and the Court must apply the plain and ordinary meanings of the terms used by the

13   parties.  *Id.* (quoting *Palmer v. Truck Ins. Exch.*, 21 Cal. 4th 1109, 1115 (1999)).  A term or

14   provision is ambiguous only "when it is capable of two or more constructions, both of which are

15   reasonable."  *Id.*  However, "[i]f a policy provision has been judicially construed, it is not

16   ambiguous and the judicial construction of the term should be read into the policy unless the

17   parties express a contrary intent."  *Id.* at 891 (quoting *Lockheed Martin Corp. v. Continental Ins.*

18   *Co.*, 134 Cal. App. 4th 187, 197 (2005)).

19       **(A)    "Occurrence"**

20       The Court's analysis begins by comparing the terms of the policies with the allegations of

21   the underlying complaint.  *State Farm Fire & Casualty Co. v. Super. Ct. (Wright)*, 164 Cal. App.

22   4th 317, 324 (2008).  Each policy provides generally that third party claims are covered if they

23   seek compensation for "property damage" caused by an "occurrence."  [*See* Doc. No. 12-5, Exhs.

24   A-E, Sections I(1)(a), (b).]

25       Each of the five policies issued to Osborne defines an "occurrence" as "an *accident*,

26   including continuous or repeated exposure to substantially the same general harmful conditions."

27   [Doc. No. 12-5, Exhs. A-E, Section V(13) (emphasis added).]  The policies do not, however,

28   define "accident."  Although the term has been judicially construed on numerous occasions, "[t]he

meaning of the term 'accident' in insurance law [was] not settled" until recently. *State Farm*, 164 Cal. App. 4th at 325. In 2009, the California Supreme Court defined "accident" "[i]n the context of liability insurance, . . . [as] an unexpected, unforeseen, or undesigned happening or consequence from either a known or unknown cause." *Delgado v. Interinsurance Exch. of the Auto. Club of S. Calif.*, 47 Cal. 4th 302, 309 (2009) (internal marks and citations omitted). The Court further clarified that the term "accident" "refers to the conduct of the insured for which liability is sought to be imposed on the insured." *Id.* at 311 (citation omitted). Thus, "[a]n accident . . . is never present when the insured performs a deliberate act unless some additional, unexpected, independent, and unforeseen happening occurs that produces the damage." *Id.* at 315. This common law construction of the term "accident" becomes part of the policies at issue in the present case. *Id.* at 308; *Lakeland Village*, 727 F. Supp. 2d at 891.

Defendant insurers NAC and FSIC move for summary judgment on the ground that they have no duty to defend Osborne because Agri-Empire's complaint derives from Osborne's intentional conduct, not an accident. According to Defendants, Agri-Empire alleges Osborne deliberately "elected to develop the Park Hill [Project] in a manner that interfered with Agri-Empire's access to and use of its easement and water rights" associated with Agri Well No. 3. [Doc. No. 14-4, p.12.] Specifically, Agri-Empire alleges Osborne: (i) removed dirt from around the well that exposed a portion of the sanitary seal; (ii) created a vertical slope on an adjacent lot, causing the potential for run-off; (iii) installed a block retaining wall that impedes access to and use of the well; (iv) built structures too close to the well, thereby impeding proper access for testing, maintenance or use; (v) constructed a home with a sewer line too near the well; and (vi) removed a four inch pipe, which prevents access to the well. [Doc. No. 12-5, Exh. F.] Osborne does not dispute it engaged in these activities intentionally during its development of the Park Hill Project, but argues its actions are at most negligent because it had no intent to harm Agri-Empire. [Doc. No. 19, p.3-4; Doc No. 14-4, p.2, 12; Doc. No. 16, p.1-3; Doc. No. 11-1, p.3-6.] Defendants argue, however, that absent an additional chance happening or event in the causal chain of events leading to Agri-Empire's purported injuries, Osborne's admittedly intentional conduct is not an accident within the policies' coverage. [Doc. No. 19, p.5-8; Doc. No. 16, p.2-3.]

Conversely, Osborne asserts that even if it acted intentionally, "the damage alleged by Agri-Empire was caused by an 'accident' because . . . Osborne did not intend the *consequences* of harm to the well owned by Agri-Empire or to interfere with Agri-Empire's access to or use of the well." [Doc. No. 13-1, p.10-11; Doc. No. 12-1, p.10-11 (emphasis added).] The Court disagrees.

In the  context of liability insurance, the term "'accident' refers to the nature of the act giving rise to liability." *Fire Ins. Exch. v. Super. Ct. (Bourguignon)*, 181 Cal. App. 4th 388, 393 (2010) (("'accident' refers to the nature of the conduct itself rather than to its consequences") (citing *Collin v. Am. Empire Ins. Co.*, 21 Cal. App. 4th 787, 810 (1994)).[3] When the insured intends all of the acts that result in the third party's injury, there is no accident. *Id*. at 392 (citation omitted). Only when "some additional, unexpected, independent, and unforeseen happening" occurs in connection with the insured's intentional conduct can the injury-producing event be deemed an accident. *Id*. (citation omitted). Thus, Osborne's focus on the consequences of its conduct is misplaced.

In *Bourguignon*, 181 Cal. App. 4th 388, for example, homeowners built a structure that encroached onto their neighbor's property. A lawsuit ensued and the homeowners tendered their defense to their insurance company. The insurer, however, declined to defend because the policy did not provide coverage for non-accidental occurrences. The California Court of Appeal agreed the insurer had no duty to defend because the homeowners intended to build the structure where they did, albeit, under the mistaken belief they were legally entitled to do so. Thus, any damage to the neighbor's property was not the result of an accident. Importantly, the appellate court also rejected the homeowners' argument that the encroachment was an accident because their engineer negligently failed to execute the documents that would have given them the legal right to build where they did. *Id*. at 396. The court explained, "the reason for their failure to obtain title is irrelevant to the determination whether the act in locating the building where they did can be characterized as an accident. There was no unexpected and unintended event between the

---

[3] *See also, Modern Dev. Co. v. Navigators Ins. Co.*, 111 Cal. App. 4th 932, 941 (2003) (where insurer intended the architectural layout of the building, by law the layout is not an accident even though it violated various statutes); *Allstate Ins. Co. v. Salahutdin*, 815 F. Supp. 1309, 1311 (N.D. Cal. 1992) ("recent cases focus on the nature of the act itself" and "on the nature of the act giving rise to the claims").

intentional construction of the building and the encroachment." *Id*. The homeowners' "mistaken belief in their legal right to build does not transform their intentional act of construction into an accident." *Id*.

*Bourguignon* is instructive in the present case. Just as the homeowners in *Bourguignon*, deliberately built a structure in a particular location, Osborne intentionally excavated soil, created a vertical slope, installed a retaining wall, constructed homes and sewer lines, and removed a portion of an access pipe. [Doc. No. 12-5, Exh. F.] Osborne does not dispute it undertook these activities deliberately, but urges that NAC and FSIC have a duty to defend because Osborne did not intend to interfere or tamper with Agri-Empire's Water Rights and Agri Well No. 3. [*See, e.g.*, Doc. No. 24, p.3.] Osborne attempts to distinguish *Bourguignon* as an outlier, and asserts the appellate court erroneously held that an insured's subjective intent is irrelevant. [Doc. No. 17, p.7-8; Doc. No. 18, p.7-8.][4] The Court is not persuaded.

In *Bourguignon*, the appellate court correctly stated, that "[w]here the insured intended all of the acts that resulted in the victim's injury, the event may not be deemed an 'accident' merely because the insured did not intend to cause injury. The insured's subjective intent is irrelevant. Indeed, it is well established in California that the term 'accident' refers to the nature of the act giving rise to liability; not to the insured's intent to cause harm." *Bourguignon*, 181 Cal. App. 4th at 392-93 (internal citations omitted). In other words, as NAC aptly states, "it is the intended conduct of the insured, and not its intent to harm, that is key." [Doc. No. 21, p.3.] Under California law, courts must first determine whether the insured intended to act as it did. If the insured acted intentionally and deliberately, the court then determines whether the insured accomplished what it intended. If the desired result was achieved, the insured's conduct generally

---

[4] Osborne also faults the *Bourguignon* court for not discussing *Meyer v. Pac. Employers Ins. Co.*, 233 Cal. App. 2d 321 (1965) and *Baugh Constr. Co. v. Mission Ins. Co.*, 836 F.2d 1164 (9th Cir. 1998). [Doc. No. 17, p.8; Doc. No. 18, p.8.]  *Baugh* does not assist Osborne's interpretation of California law, as *Baugh* was decided under Washington law.  The Court also finds *Meyer* distinguishable from the present case, and consistent with established California law.  In *Meyer*, the insured's actions did not occur as intended. The insured drilled a water well which caused vibrations to emanate onto a third party's property and cause damage. Although the insured expected its drilling to cause some vibrations, the magnitude of the vibrations exceeded what the insured intended and expected.  *Id*. at 327.  The appellate court therefore concluded the injury-producing event was accidental because it did not occur as intended.  Conversely, Osborne's construction activities occurred exactly as it intended.

is not an accident even if it also causes a third party unintended harm; an accident will exist only when some additional unforeseen or unexpected event occurs in connection with the insured's intentional conduct.  Under this established framework, it is clear that whether Osborne subjectively intended to injure Agri-Empire is irrelevant to the insurers' duty to defend, because Osborne accomplished its desired construction objectives as it intended.  The unforeseen and unintended injury to Agri-Empire does not change the deliberate character of Osborne's injury-producing conduct.

*Bourguignon* is consistent with a long line of cases interpreting the type of conduct that will constitute an accident within the meaning of CGL policies.[5]  In *Modern*, 111 Cal. App. 4th 932, an individual confined to a wheelchair brought suit against Modern Development Company ("Modern") when he was unable to access the restroom facilities at a swap meet operated by Modern.  The individual alleged the facilities contained architectural barriers in violation of the Americans with Disabilities Act ("ADA") and related California statutes that prevented him from using the restroom on the premises, thereby causing him severe physical and emotional injury.  Modern tendered its defense of the suit to its insurer, who declined to defend because the events alleged in the underlying action did not constitute an "occurrence" as defined in the policy.  The California Court of Appeal agreed.   The third party's alleged injuries resulted from Modern's deliberate conduct because Modern's construction and maintenance of the non-compliant restroom facilities was not an accidental or unforeseen occurrence.  *Id.* at 943.  "[Modern] intended for the bathrooms to be configured as they were.  The result is that the incident . . . is not a covered event." *Id.*

Here too, Osborne intended the Park Hill Project to be configured as it was.  Osborne intended to grade the dirt as it did, it intended to build the homes and the retaining walls where it

---

[5] The only case that appears to be inconsistent with *Bourguignon* and the well-established principles governing an insurer's duty to defend under California law is *Allstate Ins. Co. v. Vavasour*, 797 F. Supp. 785 (N.D. Cal. 1992).  In *Vavasour*, the district court held that if the insured acted intentionally but did not intend any harm, the insured's wrongful trespass may be considered accidental.  *Id.* at 788.  Nearly twenty years later, *Vavasour* has not been followed and is frequently criticized or distinguished by federal and California courts alike. Because *Vavasour* appears contrary to the clear weight of authority which holds that an insured's subjective intent is not relevant when the insured acts intentionally, this Court respectfully declines to follow *Vavasour*.

did, and it intended to remove the four inch pipe. "Agri-Empire alleges that its harm was directly caused by the *manner in which Osborne elected to develop its property*, i.e., by purposeful changes around the well property. No chance events are alleged as occurring *between* the deliberate acts and the resulting harms of lost value and use of the well." [Doc. No. 14-4, p.2-3 (emphasis in original).] Thus, Agri-Empire's alleged injuries to its Water Rights and Agri Well No. 3 are not the result of an accident, and do not fall within the policies' coverage.

Osborne suggests *Modern* and *Bourguignon* are distinguishable because those cases dealt with intentional torts, where the insureds acted under the mistaken belief that they were lawfully entitled to act as they did. [Doc. No. 18, p. 3.] "But Osborne does not contend that it proceeded under some *mistaken* belief that it had the legal right to develop its property. It had that right." [*Id*.] The Court disagrees. Irrespective of whether Osborne had the right to develop the Park Hill Project as it did,[6] Osborne acted intentionally. The record reveals each construction activity occurred as Osborne planned and intended. Thus, the alleged resulting harm to Agri-Empire does not qualify as an accident unless something interrupted Osborne's deliberate course of conduct to transform its actions into an accident. Osborne identifies no such intervening event.

The oft-cited example used to illustrate this principle is that of the speeding driver who negligently injures a third party in a vehicle collision. "When a driver intentionally speeds and, as a result, negligently hits another car, the speeding would be an intentional act. However, the act directly responsible for the injury—hitting the other car—was not intended by the driver and was fortuitous." *Delgado*, 47 Cal. 4th at 316 (quoting *Merced Mutual Ins. Co. v. Mendez*, 213 Cal. App. 3d 41, 50 (1989)). Under California law, the injury-causing event—the collision—is an accident because that event in the causal chain of events was not intended by the driver. Here, Osborne does not identify an unexpected or unforeseen event; the injury producing event—Osborne's construction activity—was intentional, and therefore is not an accident within the policy's coverage.

The speeding driver example also undermines Osborne's argument that its potentially negligent work is covered by the CGL policies because contractors never "accidentally" perform

---

[6] This issue is not before the Court.

construction work for which they are hired.  [Doc. No. 17, p.1; Doc. No. 23, p.2; *see also* Doc. No. 12-1, p.9 ("Indisputably, damage caused by negligence is caused by 'accident' within the policy definition of 'occurrence.'"; Doc. No. 13-1, p.9 (same).]  Although Osborne may not have foreseen that its design and construction could negatively impact Agri-Empire, the lack of foresight does not turn Osborne's intentional conduct into an accident.  The reasons why Osborne developed the Park Hill Project as it did are irrelevant to the determination whether its acts of excavating soil, creating a vertical slope, installing a retaining wall, constructing a home with a sewer line too close to the well, and removing an access pipe can be characterized as an accident simply because they had unintended consequences.  *Bourguignon*, 181 Cal. App. 4th at 396. Because Osborne has identified no unexpected nor unintended event between the intentional construction of the Project and the alleged injuries to Agri-Empire, Osborne's conduct is not an accident.  *Id*.[7]

*State Farm*, 164 Cal. App. 4th 317, exemplifies when intentional conduct results in an accident because one aspect of the causal chain of events does not occur as the insured intended. In *State Farm*, the insured picked up a third party intending to throw him into a swimming pool. The insured miscalculated the force necessary to throw the individual into the pool, and the third party landed on the pool's cement step causing him injury.  The operative insurance policy provided coverage only if the third party's injuries were the result of an accident.  Ultimately, the court determined the injuries were accidental, because although the insured intended to throw the individual into the pool, "one aspect in the causal series of events" leading to the injury "namely, the force necessary to throw [him] far enough out into the pool so he would land in the water" did not occur as the insured intended.  *Id*. at 328-29.  "The event here was an accident because *not* all of the acts, the manner in which they were done, and the objective accomplished transpired exactly as [the insured] intended."  *Id*. at 329 (emphasis in original).  The appellate court's ruling in

---

[7]  Osborne cites *Baugh*, 836 F.2d 1164, for the proposition that claims regarding negligent design and construction fall within the definition of a fortuitous event.  [Doc. No. 18, p.5.]  As previously indicated, *Baugh* is not useful to this Court's analysis of an insurer's duty to defend under California law, because *Baugh* was decided under Washington law.  For the same reason, *DeWitt Const. Ins. v. Charter Oak Fire Ins. Co.*, 307 F.3d 1127 (9th Cir. 2002), also decided under Washington law, does not assist Osborne.

*Bourguignon* is consistent with its decision in *State Farm*. In neither case did the insured intend to harm the injured third party. In *Bourguignon*, however, all the acts undertaken by the homeowners occurred exactly as they intended; they successfully built the structure where they desired. Thus, the injury-producing event was not an accident. Conversely, in *State Farm*, the insured's actions did not occur as he intended, and he inadvertently threw the third party into the cement because he misjudged the amount of force necessary to throw him into the pool—the insured deliberately threw the injured third party, but the causal series of events did not occur as he intended. Thus, the injury-producing event was an accident within the policy coverage. Applying these principles to the present case, Osborne's conduct is not an accident. Osborne intended the acts identified by Agri-Empire, and these deliberate actions occurred as Osborne intended—nothing in the causal series of events was unexpected. "[A] purposeful and intentional act remains purposeful and intentional regardless of the reason or motivation for the act." *Delgado*, 47 Cal. 4th at 314.

Federal courts applying these California principles have reached the same result.[8] In *Salahutdin*, 815 F. Supp. 1309, the District Court for the Northern District of California held that "an insurance coverage provision which covers 'damages arising out of an accident' does not cover acts intended by the insured, regardless of whether the insured intended the resulting damage." In *Salahutdin*, two neighbors, the Salahutdins and Alcantaras, disputed who owned a strip of land between their properties. Before the dispute was resolved, the Alcantaras hired a contractor to build a fence on the disputed land. The contractor used a string to align the fence, which he attached to the Salahutdins' address pole. Upset that the Alcantaras were building on the disputed land, and believing that it was in fact her property, Mrs. Salahutdin removed the string and filed suit against the Alcantaras, who then cross-complained. The Salahutdins tendered their defense to their insurer. The insurer declined to defend, indicating Mrs. Salahutdin acted intentionally when she removed the string, and therefore, her conduct did not constitute an accident within the policy coverage. In evaluating whether the insurer properly declined to defend, the district court noted that although the law on the issue was not entirely clear in 1992, "the more recent cases focus[ed] on the nature of the act itself, not the intent of the insured to

---

[8] *See* footnote 5, *supra*.

cause damage." *Id*. at 1311 ("Even where the intentional act gives rise to negligence or emotional distress claims, the courts have refused to consider these losses 'accidental.'"). "[T]he intentional act of Mrs. Salahutdin in removing the string remains the 'crucial act' in the present case. Mrs. Salahutdin intended her action." *Id*. at 1312. Accordingly, the insurer had no duty to defend because the damage was a result of Mrs. Salahutdin's intentional and deliberate conduct. Her motive for removing the string and her lack of intent to harm the Alcantaras' is irrelevant.

Under *Salahutdin*, the "crucial act" in the present action is Osborne's construction of the Park Hill Project. Specifically, the removal of dirt from around the well, which exposed a portion of the sanitary seal; creation of a vertical slope near the well; construction of a block retaining wall, homes and sewer lines too close to the well; and removal of a four inch pipe. Because these intentional actions "cannot be considered accidental merely because [Osborne] did not intend to harm [Agri-Empire]," NAC and FSIC have no obligation to defend Osborne in the underlying action. *Id*.; *see also Bailey v. State Farm Ins. Co.*, 810 F. Supp. 267, 269-70 (N.D. Cal. 1992) ("The Ninth Circuit and other courts in this district have held that if the underlying action was intentional, the subject matter of the action does not constitute an accident triggering a duty to defend or indemnify.").

Although Agri-Empire alleges Osborne acted negligently in its development of the Park Hill Project, allegations of negligence are insufficient to transform deliberate and intentional conduct into an accident. Here, Agri-Empire's alleged injuries do not stem from construction defects nor product failures in which unexpected happenings caused injury to a third party. Rather, Agri-Empire alleges it has been injured simply by virtue of Osborne's development of the Project around Agri Well No. 3. For this reason, Osborne's reliance on *Chu v. Canadian Indemnity*, 224 Cal. App. 3d 86 (1990) is unavailing. *Chu* considered whether the insurer had a duty to defend its insured when a third party claims injury from unanticipated construction defects—no unanticipated construction defects are alleged in the present case.

The California Supreme Court's recent decision in *Delgado*, 47 Cal. 4th 302, emphasizes that "it is the unexpected, undesigned, and unforeseen nature of *the injury-causing event* that determines whether there is an 'accident' within the policy's coverage." (emphasis added) (citing

*Geddes & Smith, Inc. v. St. Paul Mercury Indemnity Co.*, 51 Cal. 2d 558, 564 (1959)).  In *Delgado*, an insured hit and kicked a third party, unreasonably believing that he was acting in self defense.  The California Supreme Court concluded the insurer reasonably declined to defend because the insured's intentional acts did not qualify as an "occurrence" covered by the policy.  Even if the insured believed he had the right to strike the third party in self defense, "a purposeful and intentional act remains purposeful and intentional regardless of the reason or motivation for the act." *Id.* at 314 (citing *Hogan v. Midland Nat'l Ins. Co.*, 3 Cal. 3d 553, 560 (1970) ("whatever the motivation, a deliberate and calculated act is not an accident")).

Osborne attempts to distinguish *Delgado* on the ground that it involved an intentional tort that went awry, whereas in the present case it is undisputed that Osborne did not intend to harm Agri-Empire.  The distinction, however, is unavailing.  As previously stated, under California law the inquiry is not whether the insured intended to harm the third party—the inquiry is whether the insured intended to engage in the conduct that resulted in the injury.  The insured's subjective intent is not dispositive.

Osborne also tries to distinguish *Delgado*, and other personal injury cases, on the ground that the cases focus "on the conduct of the insured[,] and the intent to harm is presumed from the act, i.e. the act *is* the harm."  [Doc. No. 18, p.2 (emphasis in original) (citations omitted)).  Osborne misses the point.  It is exactly because Osborne's intentional act *is* the harm, that the conduct is not an accident covered by the policies.  If there were some intervening, additional, or unforeseen event that took place in connection with Osborne's deliberate construction activities, an accident may have been present.  Where, as here, the insured's deliberate conduct, alone, is the harm, there can be no accident.  Accordingly, even accepting that Osborne did not intend any harm to Agri-Empire, the undisputed facts reveal that Osborne intended to engage in the conduct that allegedly injured Agri-Empire.

/ / /

/ / /

**(B)     Extrinsic Evidence**

The extrinsic evidence provided by Osborne does not change this result.  Although an insurer will have a duty to defend "where extrinsic facts known to the insurer suggest that the claim may be covered," Osborne identifies no facts that indicate any of Agri-Empire's claims potentially fall within the policies' coverage.  *Scottsdale Ins. Co.*, 36 Cal. 4th at 654-55.   In connection with its tender, Osborne provided the following documents to NAC and FSIC in March 2010: (1) two photographs of the well taken in 2004; (2) a November 28, 2006 letter from the California Department of Health Services regarding the requirements for using Agri Well No. 3 as a municipal water source; (3) an October 10, 2007 letter from Blaine Womer Civil Engineering regarding the requirements for using Agri Well No. 3 as a municipal water source; and (4) one photograph of the well in its "current" condition.  [*See* Doc. No. 13-3, Exh. 9; Doc. No. 16-3, Exhs. 5-6.]

Osborne asserts the photographs of the well depict damage to the well's sanitary seal.  [*See, e.g.,* Doc. No. 17-2, Exh. 2, p.2.]  In the complaint, Agri-Empire does not allege physical damage to the sanitary seal itself nor any part of the well structure.  [*See generally*, Doc. No. 12-5, Exh. F.]  The record also indicates Agri-Empire has not alleged this type of damage to the well in its discovery responses.  [Doc. Nos. 11-6 to 11-10.]  Rather, Agri-Empire accuses Osborne of removing dirt around the well and *exposing* a portion of the sanitary seal, thereby decreasing the required depth of the annular seal from the ground.  [Doc. No. 12-5, Exh. F, ¶14.]  More importantly, however, even assuming the sanitary seal of the well has been physically damaged in some way not alleged by Agri-Empire in its complaint, there is no evidence indicating how or when the damage may have occurred.  "When the accidental nature of an event is a condition of coverage, the burden is on the insured to bring the claim within the scope of coverage."  *See Modern*, 111 Cal. App. 4th at 941-42.  Thus, it is Osborne's burden to demonstrate the existence of a claim potentially covered by the policies.  Osborne, however, cannot meet this burden merely by identifying an event that may have "happened in an unexplained and presumably accidental manner."  *Id.* at 942.  The photos themselves do not clearly depict damage, and there is no additional evidence describing the alleged damage to the well, or suggesting when the purported

damage may have occurred, who might be responsible, or how it happened.  Photographs of the well in allegedly different conditions in 2004 and 2010 are insufficient to bring Agri-Empire's claims within the policies' coverage.

The letters from the California Department of Health Services ("CDHS") and Blaine Womer Civil Engineering are likewise unhelpful.  The November 28, 2006, correspondence from the CDHS advised Agri-Empire of ten deficiencies that needed to be remedied before Agri Well No. 3 could be approved as a municipal water source.  [Doc. No. 13-3, Exh.9.]  Deficiency item number five relates to the well's sanitary seal.  [*Id*.]  The CDHS advised Agri-Empire, in part, that:

> Where cement-based annular sealing material is used, the concrete base shall be poured before the annular seal has set.  In this case, the annular seal has been set for 21 years, and the concrete base has yet to be poured.  A monolithic pour creates a water tight seal between the concrete base and the well sanitary seal.[]  Because it is impractical for the seal to be re-poured, CDHS requests to inspect the annular seal before the concrete base or pedestal is poured.

> . . . The Department asks that 8'-10' of soil around the well casing be removed so that a visual inspection of the annular seal can be done.[]

[*Id*.]  Thus, as of November 2006 no damage to the sanitary seal is noted.  Rather, the CDHS requested soil be removed to allow proper inspection.

Approximately one year later, Blaine Womer provided Agri-Empire with an assessment of Agri-Well No. 3, and advised Agri-Empire that a new seal would need to be poured because "the exposed portion of the sanitary seal (approximately 8' to 10') was removed, thereby decreasing the depth of the annular seal from the ground service to approximately 40' to 42'."  [*Id*.]  These documents do not reasonably suggest any accidental conduct by Osborne that may be covered by the policies.  Absent any allegations by Agri-Empire regarding physical damage to the sanitary seal, the Court declines to speculate what damage may exist, when any such damage may have occurred, or what may have caused the speculative harm.  NAC and FSIC do not have a duty to defend Osborne because the "potential for liability is so tenuous and farfetched."  *Upper Deck Co. v. Fed. Ins. Co.*, 385 F.3d 608, 614-15 (9th Cir. 2004) (citation omitted).

/ / /

**(C)    "Property Damage"**

Because Osborne has not demonstrated the existence of an "occurrence" as defined by the policies, the Court need not consider whether the Agri-Empire complaint alleges "property damage" within the policies' coverage.  *See Bourguignon*, 181 Cal. App. 4th at 396.

**II.    BREACH OF CONTRACT AND BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING CLAIMS**

Absent a duty to defend, Osborne's breach of contract and breach of the implied covenant of good faith and fair dealing claims against NAC and FSIC cannot proceed.  "It is clear that if there is no *potential* for coverage and, hence, no duty to defend under the terms of the policy, there can be no action for breach of the implied covenant of good faith and fair dealing because the covenant is based on the contractual relationship between the insured and the insurer."  *Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 36 (1995); *see also Salahutdin*, 815 F. Supp. at 1313; *Modern*, 111 Cal. App. 4th at 943.  Osborne's contract claims are based solely on NAC and FSIC's refusal to defend Osborne against Agri-Empire's claims.  Because the Court concludes the insurers had no duty to defend Osborne, Osborne's additional contract claims are unsupported.

## CONCLUSION

For the reasons set forth above, the Court **ORDERS** as follows:

(i)    Defendant NAC's motion for summary judgment against Osborne is **GRANTED** [Doc. No. 11];

(ii)    Osborne's motion for summary judgment against NAC is **DENIED** [Doc. No. 12];

(iii)    Osborne's motion for summary judgment against FSIC is **DENIED** [Doc. No. 13];

(iv)    FSIC's motion for summary judgment against Osborne is **GRANTED** [Doc. No. 14.].

(v)    Because the Court finds NAC and FSIC do not have a duty to defend Osborne, Osborne's breach of contract and breach of the implied covenant of good faith and fair dealing claims cannot proceed.  Accordingly, this order resolves all outstanding issues in this matter, and the Clerk of Court is hereby instructed to terminate the case file and enter judgment in favor of Defendants North American Capacity

Insurance Company and First Specialty Insurance Corporation, and against Plaintiff

Osborne Development Corporation.

**IT IS SO ORDERED.**

DATED:  May 11, 2011

Hon. Michael M. Anello
United States District Judge

10cv1772